IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
CIVIL ACTION NO. _____

| | |
|---|---|
| DISABILITY RIGHTS<br>   NORTH CAROLINA,<br><br>     Plaintiff,<br><br>     v.<br><br>WAKE COUNTY BOARD<br>   OF EDUCATION, and<br>ROBERT STUREY, in his<br>   individual capacity and in his official<br>   capacity as Senior Director of Special<br>   Education Services,<br><br>     Defendants. | PLAINTIFF'S MEMORANDUM IN<br>SUPPORT OF ITS MOTION FOR<br><u>PRELIMINARY INJUNCTION</u> |

## **Introduction**

Disability Rights North Carolina ("DRNC") is the agency designated by the Governor of North Carolina as the protection and advocacy ("P&A") system under the Developmental Disabilities Assistance and Bill of Rights Act ("the DD Act"), 42 U.S.C. § 15041 *et seq.*, and the Protection and Advocacy of Individual Rights ("PAIR") 29 U.S.C. § 794e, *et seq*. Simply stated, DRNC's federal mandate is to protect and advocate for the rights of persons with disabilities. Perhaps the most important part of this mandate is the protection of persons with disabilities from abuse and neglect. *See e.g.* 42 U.S.C. § 15043(a)(2)(B)("such system shall … have the authority to investigate incidents of abuse and neglect of individuals with developmental disabilities if the incidents are reported to the system or if there is probable cause to believe that the incidents occurred.").

Defendants Wake County Board of Education ("WCBOE") and Robert Sturey, Senior Director of Special Education Services for the Wake County Public School System, have denied DRNC access to the self-contained classroom for children with autism at Carroll Middle School in Raleigh, NC. DRNC sought this access so that DRNC might conduct an investigation into abuse that has been alleged to have occurred in the classroom. Defendants have also refused to supply DRNC with the names and contact information for the parents and guardians of children in the classroom so that DRNC might obtain releases from the parents and guardians and thereby gain access to the educational and other records for these children.

DRNC now seeks a preliminary injunction to prevent the Defendants from further hindering DRNC's efforts to investigate the alleged abuse.

**Facts**

As part of its normal intake procedures, DRNC frequently receives telephone calls from parents of children with disabilities who are experiencing difficulties with the education of their children. In April 2008, DRNC received a call from the parent of Student A[1] complaining that her son had been placed in handcuffs by the School Resource Officer ("SRO"). Sullivan Decl. ¶ 2 (attached as Exhibit 1). Over the course of the following months, Attorney Kristine Sullivan of DRNC advised the parent of Student A concerning the student's rights to be free from unreasonable restraint. Ms. Sullivan learned that Student A, a child with autism, was assigned to a self-contained classroom for children with autism at Carroll Middle School in Raleigh, NC. Id. at ¶ 3. Ms.

---

[1] The federal regulation governing the operation of P&As such as DRNC provide that the P&A must be "authorized to keep confidential the names and identity of individuals who report incidents of abuse and neglect and individuals who furnish information that forms the basis for a determination that probable cause exists." 45 CFR § 1386.22(e)(3).

Sullivan spoke to the Wake County Sheriff's Office, by whom the SRO is employed, as well as knowledgeable individuals at the North Carolina Justice Academy and the North Carolina Department of Public Instruction. Id. at ¶ 5.

In late August 2008, DRNC received another call relating to the self-contained classroom for children with autism at Carroll Middle School. Again, the complaint related to the use of physical restraints on children in the classroom. Sullivan Decl. ¶ 7. Ms. Sullivan spoke to the parent of Student B, who related that he had made complaints to the Principal at Carroll Middle School because Student B had returned home from school with bruises on his arms arising from methods of physical restraint used by the classroom staff. Id. Ms. Sullivan also learned from the parent of Student B that the teacher and aides in the classroom had encouraged the students with autism to wrestle one another in an adjoining, vacant classroom in order to "let out their aggression." Id. The staff had designated the adjoining classroom as the "WWF Room."[2]

In discussing the situation with other attorneys at DRNC, Ms. Sullivan learned that in March 2008, another DRNC attorney had been approached (informally) by a friend who had questions about her rights as a parent of a child with autism. This second DRNC attorney believed that the parent's child (Student C) was enrolled in the same classroom as Student A and Student B. Ms. Sullivan thereafter spoke to the parent of Student C, who confirmed that her child had been in the same classroom for most of the previous school year. Sullivan Decl. ¶ 10. Ms. Sullivan was also informed that Student C, a child with autism, had been so traumatized by events in the classroom (mostly related to the use of restraints on other students), that Student C began to suffer migraine

---

[2] Presumably, WWF refers to the popular World Wrestling Federation.

headaches and panic attacks at the prospect of going to school. Ms. Sullivan also learned from the parent of Student C that she had voiced her concerns to the Principal at Carroll Middle School and those at the Special Education Services for the school system. Sullivan Decl. ¶ 11.

In a letter dated August 25, 2008, Ms. Sullivan notified Defendant Robert Sturey, the Senior Director of Special Education Services for the school system, that attorneys and advocates from DRNC would be investigating the allegations concerning the use of improper physical restraints in the classroom for children with autism at Carroll Middle School. DRNC requested that its investigators be given access to the classroom in order to speak with students and staff, and that the names and contact information for the parents and guardians of the students be provided to DRNC in order to obtain releases from them.[3] The letter provided detail concerning the statutory basis for DRNC's request. By letter dated September 5, 2008 counsel for Wake County Public Schools responded to DRNC's letter and, citing purported privacy concerns, refused to provide the names and contact information to DRNC.

In further discussions, Wake County Public Schools also refused to permit DRNC to have access to the classroom so that the students and staff might be questioned about the alleged abuse. The school system offered only to permit DRNC to inspect the

---

[3] *See* 45 CFR § 1386.22(i): "If a system is denied access to facilities and its programs, individuals with developmental disabilities, or records covered by the Act it shall be provided promptly with a written statement of reasons, including, in the case of a denial for alleged lack of authorization, the name and address of the legal guardian, conservator or other legal representative of an individual with developmental disabilities." This regulation has been construed to permit a P&A to obtain contact information if the requisite probable cause determination has been met. *Conn. Office of Prot. & Advocacy for Persons with Disabilities v. Hartford Bd. of Educ.*, 355 F.Supp.2d 649 (D. Conn. 2005), *aff'd*, 464 F.3d 229 (2nd Cir. 2006).

classroom after the school day had ended and students and staff were no longer present. As to DRNC's efforts to interview the classroom staff, the school system stated that it would inform the staff of DRNC's interest in speaking to them. However, the school system would not make its staff available to DRNC or permit the staff to be interviewed on school property, and would, in fact, instruct the staff to refrain from disclosing any information "derived from the students' records." The refusal of the school system to cooperate with the investigation undertaken by DRNC was based upon the same purported privacy concerns articulated in its earlier letter.

On September 16, 2008, DRNC filed this suit against the Wake County Board of Education and Mr. Sturey.

## Argument

**I.     DRNC IS ENTITLED TO A PRELIMINARY INJUNCTION.**

In determining whether to grant a preliminary injunction, the Court is guided by the familiar analysis set out in *Blackwelder Furniture Co. v. Seilig Manufacturing Co.*, 550 F.2d 189 (4th Cir. 1977), where the Court is instructed to balance the following four factors: (1) the likelihood of irreparable harm to the plaintiff if the injunction is denied; (2) the likelihood of harm to the defendant if the injunction is granted; (3) the likelihood that the plaintiff will succeed on the merits; and (4) the public interest. *Department of Labor v. Wolf Run Mining Co.*, 452 F.3d 275, 280 (4th Cir. 2006). As will be shown in the discussion that follows, application of the *Blackwelder* factors to the circumstances of the instant case favors entry of an order allowing the injunction requested by DRNC.

## A. DRNC Will Be Irreparably Harmed if the Injunction is Denied.

DRNC is suffering irreparable harm by the Defendants' refusal to allow access to the self-contained classroom for children with autism and by refusing to supply DRNC with the names and contact information for the parents and guardians of children in the classroom. This denial frustrates the mission of protecting the rights of individuals with developmental disabilities and poses a threat to DRNC's ability to discharge its obligations as the Protection & Advocacy (P&A) system for North Carolina. Congress vested P&A agencies with extensive authority to investigate incidents of abuse and neglect. *See* 42 U.S.C. § 15043(a)(2). Whenever a P&A receives a complaint related to abuse or has probable cause to investigate allegations of abuse or neglect, it has been vested by Congress with the authority to obtain access to facilities and information concerning individuals with disabilities. As the P&A agency for North Carolina, DRNC's mission here is to assure that students with disabilities receive the education to which they are entitled in an environment free of abuse and neglect. Also, Congress has found that providing funding for independent advocacy groups such as DRNC is necessary because persons with disabilities are vulnerable to abuse, injury and neglect and because the states' response to these problems has often been inadequate. *Pennsylvania Protection and Advocacy, Inc. v. Houston*, 228 F.3d 423, 425 (3d Cir. 2000).

Courts have held that there can be "no dispute" that a P&A is irreparably harmed if it is "prevented from pursuing fully … its duty to investigate circumstances providing probable cause to believe abuse or neglect may be occurring." *Iowa Protection & Advocacy System, Inc. v. Rasmussen,* 206 F.R.D. 630, 2001 WL 1809404, at *5 (S.D.

6

Iowa, March 12, 2001)(quoting *Iowa Protection & Advocacy System, Inc. v. Gerard Treatment Programs, L.L.C.*, 152 F.Supp.2d 1150, 1173); see also *Wisconsin Coalition for Advocacy, Inc. v. Czaplewski,* 131 F.Supp.2d 1039, 1051 (E.D. Wis. 2001); *Advocacy Ctr. v. Stalder*, 128 F.Supp.2d 358 (M.D. La. 1999).

DRNC will be irreparably harmed if it is not able to fulfill its obligation to investigate allegations of abuse and neglect and provide protection and advocacy services to student who have been and may still be at risk of abuse. Carroll Middle School and the school system have both been placed on notice and given many opportunities to remedy the situation in this classroom. However, the situation remains unresolved as DRNC receives more allegations from concerned parents regarding the excessive use of physical restraint in the class.

### B.     There Is No Likelihood of Harm to the Defendant if the Injunction Is Granted.

Defendants will not be harmed if the requested injunctive relief is granted and DRNC is granted access to the classroom and supplied with the names and contact information for the parents and guardians of children in the classroom. The school system has stated its concerns about the confidentiality and privacy rights of its students. The defendants have erroneously assumed that the goal of the P&A is inconsistent with the goal of the school system. The two missions are in fact consistent. DRNC is obligated, as are all P&As, to safeguard the confidentiality of information it acquires just as the school system is required to do so under the Family Educational and Privacy Rights Act (FERPA).[4]  DRNC – like all other P&As – seeks to gain access to schools

---

[4] A P&A Agency must protect a client's record "from loss, damage, tampering, or use by unauthorized individuals" and must "keep confidential all information contained in a client's records." 45 C.F.R. § 1386.22(e).

7

and other locations providing services for only one purpose: to protect the welfare of the population whose privacy rights are being asserted. The school system seeks to use FERPA as a means to block such access. However, there is no conflict between the P&A access authority and FERPA; therefore, there will be no harm to the school system if the injunction is granted. *See Connecticut Office of Protection & Advocacy for Persons with Disabilities v. Hartford Board of Education*, 464 F.3d 229, 236 (2d Cir. 2006)(discussing relationship between FERPA and P&A access rights). Moreover granting DRNC access to the classroom does not implicate FERPA in any respect. *Id.* ("FERPA does not prohibit [a P&A] representative from observing a classroom or speaking with students."). In any case, the privacy interests asserted by the Defendants are outweighed by DRNC's broad mandate to investigate and remedy suspected abuse or neglect. Finally, information relating to the names and contact information for parents and guardians does not violate the confidentiality provision of FERPA. *Id. at* 245 n. 6 (noting that the defendant school system abandoned its reliance on FERPA as prohibiting the release of the contact information). In sum, the school system will not be harmed if the preliminary injunction is granted.

### C. **Plaintiff Will Succeed on the Merits of Its Case.**

DRNC is likely to succeed on the merits of its claim as the Defendants' actions are in clear contravention of statutory and case law. The DD Act created the P&A system to investigate and remedy the abuse and neglect of persons with developmental disabilities. To accomplish this goal, Congress granted P&As broad investigative access rights.[5] The federal statutes and regulations establish a P&A's right to obtain records as

---

[5] Se e.g., 42 U.S.C. § 15043(a)(2).

8

part of its investigation. The P&A is entitled to access the records of a person with a disability when the individual has a legal representative, the P&A has received a complaint <u>or</u> has probable cause to believe that such individual has been subject to abuse or neglect, and the P&A contacts the individual's legal representative upon receiving the name and address of such representative. 29 U.S.C.S. § 794e(f)(2); 42 U.S.C.S. § 15043(a)(2)(I)(iii). The provision regarding contact with a legal representative "upon receipt of the name and address of such representative" has been interpreted to permit the P&A to obtain the names and addresses of students for whom there is the requisite degree of probable cause to demand records – that is, there is probable cause to believe that abuse or neglect may have taken place. *See Conn. Office of Prot. & Advocacy for Persons with Disabilities v. Hartford Bd. of Educ.*, 355 F.Supp.2d 649 (D. Conn. 2005), *aff'd*, 464 F. 3d 229 (2$^d$ Cir. 2006); *Disability Rights Wisconsin, Inc. v. State Dep't of Public Instruction*, 463 F.3d 719 (7th Cir. 2006). Plainly, DRNC has the authority to obtain the names and addresses of students for whom there is the requisite degree of probable cause to demand records, in order to contact their legal representatives.

Likewise, the authority of a P&A to access a facility for investigative purposes couldn't be clearer:

> A system shall have reasonable unaccompanied access to public and private facilities which provide services, supports, and other assistance for individuals with developmental disabilities in the State when necessary to conduct a full investigation of an incident of abuse or neglect under Section 142(a)(2)(B) of the Act. *This authority shall include the opportunity: to interview any facility service recipient, employee, or other person, including the person thought to be the victim of such abuse, who might be reasonably believed by the system to have knowledge of the incident under investigation*; and to inspect, view and photograph all areas of the facility's premises that might be reasonably believed by the system to have been connected with the incident under investigation.

45 CFR 1386.22 (f) (emphasis added).

There can be little question that DRNC's evidentiary demonstration meets the threshold probable cause requirement. That being the case, DRNC is likely to succeed on the merits of its case.

### D. The Public Interest Will be Advanced by the Grant of Injunctive Relief.

Congress created the P&A system to protect the interests of persons with disabilities from the kind of abuse that is implicated by the allegations of this complaint. Congress acknowledged that in order for a P&A to carry out its obligation, it must have broad access rights. The public interest will be advanced by preventing harm to the students at Carroll Middle School and allowing DRNC to have access to the classroom and the names and contact information requested. The public interest will not be served if the Defendants are allowed to employ FERPA or other purported privacy considerations as a shield to protect themselves from oversight and investigation.

September 16, 2008
Date

DISABILITY RIGHTS NORTH CAROLINA

/s/ John R. Rittelmeyer
John R. Rittelmeyer
N.C. Bar No. 17204
Iris Peoples Green
N.C. Bar No. 27861
2626 Glenwood Ave. Suite 550
Raleigh, NC 27608
(919) 856-2195 (telephone)
(919) 856-2244 (facsimile)